*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
THE COURT EN BANC[1]

_____

**Michael J. BROWN**
First Sergeant (E-8), U.S. Marine Corps
Petitioner

**v.**

**UNITED STATES**
Respondent

**No. 201900050**

Decided: 29 April 2020

Review of Petition for Extraordinary Relief
in the Nature of a Writ of Mandamus and Writ of Prohibition

Military Judge:
Roger E. Mattioli

Sentence adjudged 5 March 2018 by a special court-martial convened at Marine Corps Base Quantico, Virginia, consisting of officer and enlisted members: reduction to E-7.[2]

For Appellant:
*Lieutenant Michael W. Wester, JAGC, USN*

---

[1] Senior Judge HITESMAN took no part in the consideration or decision of this case.

[2] The convening authority has not yet taken action on the findings or sentence.

For Appellee:
*Major Kelli A. O'Neil, USMC*
*LCDR Timothy C. Ceder, JAGC, USN*
*Captain Luke Huisenga, USMC*
*LT Jennifer Joseph, JAGC, USN*

Senior Judge TANG delivered the opinion of the Court, in which Chief Judge CRISFIELD, Senior Judge KING, and Judges GASTON and STEWART joined. Judge LAWRENCE filed a separate dissenting opinion, in which Judge STEPHENS joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

TANG, Senior Judge:

Following his conviction at special court-martial, but prior to the convening authority's action, Petitioner seeks extraordinary relief from this Court in the nature of a writ of mandamus or a writ of prohibition. Specifically, he requests that we remove the military judge, grant a mistrial, or appoint a special master to investigate allegations of unlawful command influence [UCI]. We granted Petitioner's request to stay his court-martial proceedings and directed further briefing regarding this Court's jurisdiction to entertain the petition and authority to grant the relief requested.[3] Having considered the Petitioner's prayer for relief and the parties' briefs on the specified issues, we conclude we have jurisdiction to entertain the petition and further find that Petitioner has demonstrated a clear and indisputable right to a portion of the requested relief.

## I. BACKGROUND

A panel of officer and enlisted members sitting as a special court-martial convicted Petitioner of abusive sexual contact and disorderly conduct, and

———

[3] A panel of this Court previously issued an opinion, *Brown v. United States,* No. 201900050, 2019 CCA LEXIS 270 (N-M. Ct. Crim. App. Jun. 27, 2019) (op. withdrawn). The Court En Banc granted the Government's request for reconsideration and withdrew the prior panel opinion.

sentenced him to be reduced to paygrade E-7. Prior to acting on the sentence, the convening authority granted Petitioner's request to convene a post-trial hearing pursuant to Article 39(a), Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 839(a) (2012), to address legal errors asserted in Petitioner's clemency request. Specifically, the convening authority convened the post-trial hearing to address the following issues: (1) whether the military judge properly declined to provide a mistake of fact instruction; (2) whether he properly prohibited the Defense from presenting evidence of Petitioner's character for truthfulness; and (3) whether he properly prohibited the Defense from rehabilitating a key Defense witness' character for truthfulness.

At the Article 39(a) hearing, Petitioner moved to disqualify the military judge for bias or the appearance of bias. In support of his motion, Petitioner conducted voir dire of the military judge and introduced evidence that during the trial the military judge had appeared biased in favor of the Government and antagonistic toward Petitioner's trial defense counsel. After hearing oral argument on that motion, the military judge denied the motion to recuse himself. He then summarily denied oral argument on the three trial-related issues the post-trial hearing had been convened to address. Instead, he stated he would review the record, including the briefs of the parties, and issue written rulings on those issues. Before the military judge issued his rulings, Petitioner filed the instant petition for extraordinary relief with this Court.

## II. DISCUSSION

This case presents the issue of whether this Court may entertain a petition for extraordinary relief, even where it does not appear likely that mandatory appellate review by this Court will obtain, in order to ensure the fairness of pending court-martial proceedings. The type of harm alleged—the bias or apparent bias of the presiding military judge—goes to the core of such proceedings' fairness, and we are asked to take appropriate action to remedy that alleged harm before it takes root.

### A. Jurisdiction

"The courts of criminal appeals [CCAs] are courts of limited jurisdiction, defined entirely by statute." *United States v. Arness*, 74 M.J. 441, 442 (C.A.A.F. 2015). The All Writs Act empowers this Court to "issue all writs necessary or appropriate in aid of [our] jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see also United States v. Denedo*, 556 U.S. 904, 911 (2009); *LRM v. Kastenberg*, 72 M.J. 364, 367 (C.A.A.F. 2013). However, that Act does not serve as "an independent grant of jurisdiction, nor does it expand [our] existing [limited] statutory jurisdic-

tion." *Kastenberg*, 72 M.J. at 367 (citing *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999)). Therefore, under the All Writs Act, there are two distinct analyses: (1) whether the writ is "in aid of the [C]ourt's existing jurisdiction"; and (2) whether the writ is "necessary or appropriate," which relates to the merits of the issue and the propriety of a court granting relief outside of the normal appellate process. *Denedo v. United States,* 66 M.J. 114, 119 (C.A.A.F. 2008) (internal quotation marks omitted).

### 1. The doctrine of potential jurisdiction

While appellate jurisdiction remains essentially inert during the pendency of trial proceedings, the Supreme Court has held that the power to issue writs "is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal." *FTC v. Dean Foods Co.*, 384 U.S. 597, 603 (1966) (quoting *Roche v. Evaporated Milk Assn.,* 319 U.S. 21 (1943)). The power also "extends to the potential jurisdiction of the appellate court where an appeal is not then pending but *may be later perfected.*" *Id.* (emphasis added). As the Court of Appeals for the Armed Forces [CAAF] has explained, "the doctrine of potential jurisdiction allows appellate courts to issue opinions in matters that *may reach* the actual jurisdiction of the court." *United States v. Howell*, 75 M.J. 386, 397 n.4 (C.A.A.F. 2016) (emphasis added) (citing *Dean Foods*, 384 U.S. at 603). And even when exercising such authority, we are limited to taking only such action as is necessary or appropriate in aid of our existing jurisdiction and are not broadly empowered to "oversee all matters arguably related to military justice." *Ctr. for Constitutional Rights v. United States*, 72 M.J. 126, 129 (C.A.A.F. 2013) (quoting *Clinton v. Goldsmith,* 526 U.S. 529, 536 (1999)).

The doctrine of potential jurisdiction thus gives us authority to issue writs in cases with a possible pathway to our review but for which an appeal has not been—and may never be—perfected. Our potential jurisdiction here stems principally from two statutes, Articles 66 and 69, UCMJ, 10 U.S.C. §§ 866, 869, which provide parallel paths for a special court-martial to find its way to this Court for review. First, Article 66 provides that the Judge Advocate General [JAG] shall refer to the CCA the records for every trial "in which the sentence, as approved, extends to death, dismissal of a commissioned officer, cadet, or midshipman, dishonorable or bad-conduct discharge, or confinement for one year or more." Article 66(b)(1), UCMJ. Second, Article 69 provides that for cases tried at special court-martial resulting in an approved sentence not meeting the above threshold, the office of the JAG, "upon application of the accused," may review each case for "error prejudicial to the substantial rights of the accused" (among other things) or the JAG may send it to the CCA for such review. Arts. 69(b), 69(d), UCMJ.

The CAAF has applied the doctrine of potential jurisdiction to support the authority of CCAs to entertain petitions for extraordinary relief in a variety of contexts. In *Hasan v. Gross,* the CAAF considered a petition for a writ of prohibition to prevent enforcement of the military judge's order to forcibly shave the appellant's beard prior to trial or, in the alternative, a writ of mandamus ordering removal of the military judge. 71 M.J. 416 (C.A.A.F. 2012). Applying the "heightened standard required for mandamus relief," the CAAF ordered the military judge removed from the case due to his apparent bias. *Id.* Although the CAAF did not specifically discuss jurisdiction, the only possible basis was potential jurisdiction—i.e., appellate jurisdiction *if* Hasan were eventually convicted and sentenced.[4]

Subsequently, in *LRM v. Kastenberg*, the CAAF held the Air Force Court of Criminal Appeals erred in finding it lacked jurisdiction to consider an alleged sexual assault victim's petition for a writ of mandamus to compel the military judge to allow her special victims' counsel to be heard on matters involving her rights under Military Rules of Evidence 412 and 513. 72 M.J. 364 (C.A.A.F. 2013). Reiterating that the requested writ must be in aid of the CCA's existing jurisdiction, the CAAF explained that "[i]n the context of military justice, 'in aid of' includes cases where a petitioner seeks 'to modify an action that was taken within the subject matter jurisdiction of the military justice system.'" *Id.* at 368 (quoting *Denedo*, 66 M.J. at 120). The CAAF found it had jurisdiction in *LRM* notwithstanding the pretrial procedural posture of the case, since "[a] writ petition may be 'in aid of' a court's jurisdiction even on interlocutory matters where no finding or sentence has been entered in the court-martial." *Id.*

Similarly, in *United States v. Howell,* the CAAF affirmed that CCAs have jurisdiction to grant a writ of prohibition after findings and sentence have been reached and the record of trial authenticated, but before the convening authority has acted. 75 M.J. 386, 390 (C.A.A.F. 2016). In *Howell,* the military judge awarded confinement credit under Article 13, UCMJ, and the Government contested the propriety of the credit. The CAAF held that even though the sentence had not been approved by the convening authority (and so the case was not yet subject to the CCA's mandatory appellate review under Article 66(b)), the writ was in aid of the court's existing jurisdiction because

---

[4] The CAAF later explained that the basis for jurisdiction in *Hasan* was that the "harm alleged by the appellant—that the military judge was biased—had the potential to directly affect the findings and sentence." *Ctr. for Constitutional Rights*, 72 M.J. at 129.

the writ had "the potential to directly affect the findings and sentence," which is within the court's authority under Article 66. *Howell,* 75 M.J. at 390 (quoting *Ctr. For Constitutional Rights,* 72 M.J. at 129).[5]

Only where there is *no* pathway to its actual jurisdiction has the CAAF found a CCA to be deprived of potential jurisdiction to entertain a writ petition. *United States v. Arness,* 74 M.J. 441 (C.A.A.F. 2015). In *Arness,* the petitioner's approved sentence did not meet the jurisdictional threshold required for the CCA's mandatory review under Article 66(b), which foreclosed that statutory pathway to actual jurisdiction. *Id.* at 442. In addition, after completing his review, the Air Force JAG had already elected *not* to forward the case to the CCA for review under Article 69(d), which foreclosed the other statutory pathway to actual jurisdiction. *Id.* Hence, by the time Arness filed his writ petition, his case had *no* possible path to appellate review by the CCA and was effectively over. Unsurprisingly, the CAAF concluded the CCA lacked jurisdiction over the writ petition, focusing on the fact that *both* pathways to actual jurisdiction—Article 66 *and* Article 69—were closed. *Id.* at 443.

*2. Analysis*

Applying this law to the facts and circumstances of this case, we find we have potential jurisdiction and may entertain the petition. While the adjudged sentence of reduction to E-7 (as yet unapproved) would appear likely to foreclose the pathway to mandatory appellate review under Article 66, that proposition is itself tenuous, as it rests on the assumption that none of the issues taken up at the post-trial Article 39(a) session results in a mistrial.[6] In any event, even assuming there is no pathway to mandatory jurisdiction under Article 66, the Article 69 pathway to jurisdiction remains open since

---

[5] A CCA's authority under Article 66 is to "affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Art. 66(c), UCMJ.

[6] *See United States v. Shahan,* No. ARMY MISC 20160776, 2016 CCA LEXIS 740, at *16 (A.C.C.A. Dec. 23, 2016) (unpub. op.) (finding that granting a mistrial is within a trial court's discretionary authority under Rule for Courts-Martial [R.C.M.] 915(a), *Manual for Courts-Martial, United States* (2016 ed.), to remedy an issue of instructional error after findings have been announced); R.C.M. 915(c) ("A declaration of a mistrial shall have the effect of withdrawing the affected charges and specifications from the court-martial [and] . . . shall not prevent trial by another court-martial on the affected charges and specifications . . . .").

the JAG could still receive the case and send it to this Court for review. As we have previously found, Article 69 can just as validly serve as a source of this Court's potential jurisdiction as Article 66. *See United States v. Booker*, 72 M.J. 787, 797 (N-M. Ct. Crim. App. 2013) (concluding that review of a writ petition "is 'in aid' of our jurisdiction [where] we could also acquire appellate jurisdiction over this case if the Judge Advocate General exercised her authority under Article 69(d), UCMJ, to forward the record of trial to us for review following a finding of guilty").[7]

This view is consistent with our superior court's precedents, in which the doctrine of potential jurisdiction has repeatedly allowed appellate courts to entertain petitions for extraordinary relief so long as a pathway to actual appellate jurisdiction still exists. Such potential jurisdiction exists even though there may still be several conditions precedent to ultimate review by the CCA at the time the writ petition is filed, and it exists even if there is a chance the case will *never* receive CCA review, as long as some pathway to our actual jurisdiction yet remains. Indeed, the cases discussed above in which potential jurisdiction was found to exist all involved intervening conditions precedent to perfection of CCA jurisdiction, making it possible that each case could ultimately have escaped appellate review.

---

[7] The Government argues that *Arness* "abrogate[s]" this Court's holding in *United States v. Booker* insofar as it found potential jurisdiction existed based on the JAG's possible referral under Article 69(d), UCMJ. Respondent's Answer on Specified Issue of 5 Apr 2019 at 9. We disagree. In *Arness,* CAAF did not address the concept of potential jurisdiction because Arness sought a writ of error *coram nobis*. The Court premised its decision on two main points: (1) the statutory interpretation of Article 69(d), UCMJ, focusing on the words "in such case"; and (2) its rejection of two prior Court of Military Appeals cases and their "expansive concepts of remedial jurisdiction" that were "seriously undermined" by the Supreme Court's holding in *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999). *Arness*, 74 M.J. at 443. *Booker* relied on neither of the premises CAAF rejected in *Arness.* In fact, this Court has previously held it had jurisdiction to consider an extraordinary writ in a case incapable of meeting the sentence threshold for mandatory CCA review under Article 66. *See United States v. Black,* No. 200600042, 2006 CCA LEXIS 104 (N-M. Ct. Crim. App. May 15, 2006) (unpub. op.) (finding the Court had jurisdiction to consider the extraordinary writ but denying relief in a case involving an officer facing special court-martial).

In *Howell,* the sentence that was adjudged would trigger Article 66 appellate review only if the convening authority were to approve it.[8] However, based on the version of Article 60 applicable at the time of Howell's offenses, the convening authority had "clear unfettered discretion . . . to modify the findings and sentence." *United States v. Nerad,* 69 M.J. 138, 145 (C.A.A.F. 2010); *see also* Article 60(c)(1), UCMJ, 10 U.S.C. § 860(c)(1) (2006) ("The authority under this section to modify the findings and sentence of a court-martial is a matter of command prerogative involving the discretion of the convening authority.").[9] Hence, the convening authority could have radically modified the sentence, or disapproved the findings and sentence entirely, as a matter of "command prerogative." *Id.* Yet the CAAF still found potential jurisdiction in spite of the lack of an "approved" sentence triggering our mandatory review under Article 66. This jurisdictional prerequisite is not unlike the prerequisite under Article 69(d) for our actual jurisdiction in Petitioner's case.

In *LRM* and *Hasan*, the writ petitions were filed *prior to trial*. Thus, at the time the CCAs were deciding whether they had potential jurisdiction to hear those petitions, it was unknown whether the accused in those cases would even be convicted, let alone whether the sentence would be above the Article 66(b) threshold and, if so, whether that sentence would be approved by the convening authority. The multiple procedural assumptions that had to be made to view those cases as possibly qualifying for appellate review under Article 66(b) are no different in kind from the assumptions required here to divine whether the JAG will receive a qualifying appeal and elect to forward the case to this Court for review under Article 69(d).[10] Nevertheless, the

---

[8] Recall that a CCA's mandatory jurisdiction under Article 66(b), UCMJ, is based on the sentence being above a certain threshold "as approved" by the convening authority. 10 U.S.C. § 866(b) (2006).

[9] The National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, 127 Stat. 672 (2013), amended Article 60(c)(4), UCMJ, and restricted the convening authority's authority to modify sentences for all but the most minor offenses committed on or after 24 June 2014. Specifically, the changes to Article 60(c)(4), UCMJ, prohibit the convening authority from "disapprov[ing], commut[ing], or suspend[ing] in whole or in part an adjudged sentence of confinement for more than six months or a sentence of dismissal, dishonorable discharge, or bad conduct discharge" unless certain exceptions exist.

[10] Again, this is assuming none of the issues taken up at the post-trial Article 39(a) session results in mistrial, which would revive the possible pathway to review under Article 66.

CAAF still held jurisdiction existed to consider the writ petitions in both *LRM* and *Hasan*.

Nor is the potential for harm less here than in any of those cases. Arguably, the alleged bias of the military judge has a far greater potential to prejudice Petitioner's substantial rights in this case—and affect the findings and sentence—than a special victims' counsel's ability to present oral argument, which the CAAF in *LRM* found could impact the military judge's determination of what evidence would be admitted at trial.[11] Indeed, the harm alleged in *Hasan*—the bias or apparent bias of the presiding military judge—is precisely the harm Petitioner seeks relief from here. The CAAF recognized that this harm has the potential to directly affect the findings and, by extension, the sentence with respect to potential jurisdiction vis-à-vis Article 66 review by a CCA. Such harm could also cause error prejudicial to the substantial rights of Petitioner with respect to potential jurisdiction vis-à-vis Article 69 review. The mere fact that Petitioner's court-martial has arrived at findings and a sentence (both as yet unapproved) does not change this analysis.[12]

The number of further steps that must be taken to perfect an appeal establishing the Court's actual jurisdiction, or the likelihood that the relevant decision-makers will make the requisite decisions, is and should not be legally dispositive. It is an equally unnecessary—and impossible—task for judges to divine in advance how the members would act in *Hasan* or *LRM*, how the convening authority would act in *Howell*, or how the JAG will act in this case, when deciding issues of potential jurisdiction.[13] Here, the simple

---

[11] And here, a principal issue regarding the alleged bias or appearance of bias by the military judge is his unwillingness to hear oral argument on various post-trial issues from the *parties*' counsel, which arguably has a much greater potential to impact the findings and sentence than hearing oral argument on discrete issues of privilege from an alleged victim's counsel.

[12] Moreover, the convening authority in this case ordered the post-trial Article 39(a) session "to reconsider . . . trial ruling[s] that substantially affect[] the legal sufficiency of any findings of guilty or the sentence." Rule for Courts-Martial [R.C.M.] 1102(b)(2). Reconsideration of those rulings could result in a mistrial, which would affect the findings and sentence.

[13] Nowhere in *Howell* did the CAAF speculate about the likelihood that the convening authority would approve the sentence as adjudged. The court merely held "the doctrine of potential jurisdiction allows appellate courts to issue opinions in "matters that *may reach* the actual jurisdiction of the court." *United States v. Howell*, 75 M.J. 386, 397 n.4 (C.A.A.F. 2016) (emphasis added) (citing *Dean Foods*, 384 U.S. at 603).

fact remains that this case may yet reach our jurisdiction. That makes this case similar to *Howell, LRM,* and *Hasan,* and unlike *Arness* (in which *both* the Article 66 and the Article 69 pathways were foreclosed). Because Petitioner's case may still reach this Court, and because the error he alleges has the potential to prejudice his substantial rights and the potential to directly affect the findings and sentence, we conclude we have potential jurisdiction to entertain his writ petition.

The Government misconstrues *Arness*[14] in arguing that since the JAG's referral decision is a "statutory prerequisite" for CCA review of the case on direct appeal, a CCA has no potential jurisdiction through the Article 69 pathway *until* the JAG makes that referral decision. *See Arness*, 74 M.J. at 443. First, the CAAF's denial of potential jurisdiction in *Arness* focuses on the fact that not only had the approved sentence failed to meet the threshold for mandatory review under Article 66, but the JAG had *already* elected not for refer the case for CCA review under Article 69 and the case was final under Article 76. *Arness*, 74 M.J. at 443. Under such circumstances, it is unsurprising that the CAAF found "the CCA misread Article 69 and, in doing so, its own jurisdiction." *Id.* Here, unlike in *Arness,* the JAG has not yet made any decision under Article 69, and since such a decision could still send the case to this Court for review, the pathway for potential jurisdiction under Article 69 remains open.

Second, construing *Arness* in this fashion would undermine the doctrine of potential jurisdiction itself, which is premised on the very idea that "an appeal is not then pending but *may be later perfected*," statutorily or otherwise. *Dean Foods*, 384 U.S. at 603 (emphasis added). The JAG's referral decision under Article 69 is no more or less a "statutory prerequisite" than the requirement of a convening authority's approval of a sentence meeting the threshold under Article 66(b)(1). Yet despite this "statutory prerequisite" under Article 66(b)(1), the CAAF has repeatedly found that CCAs have potential jurisdiction via Article 66 to entertain writ petitions in cases without an "approved" sentence meeting that threshold (*Howell*) or, indeed, without any sentence at all (*Hasan* and *LRM*). The cart-before-the-horse view that the statutorily-relevant decision for initiation of a CCA's actual jurisdiction (whether by the convening authority or the JAG) must be made *before* potential jurisdiction could obtain inexorably leads to the conclusion that no

---

The existence of potential jurisdiction did not turn on the likelihood of actual jurisdiction resulting, merely its possibility.

[14] *See* Resp't's Answer on Spec'd Issue of 5 Apr 2019 at 6.

case would ever be subject to potential jurisdiction by a CCA, in contravention of *Dean Foods*.

Lastly, *Arness* is in any event distinguishable in one important aspect because it involved a petition for a writ of error *coram nobis* filed after completion of appellate review by the JAG under Article 69, UCMJ. A writ of error *coram nobis* is fundamentally different from a writ of mandamus. The Latin phrase *coram nobis* "literally translates 'let the record remain before us.'" *Loving v. United States*, 62 M.J. 235, 251 (C.A.A.F. 2005) (citation omitted). *Coram nobis* is "simply a further 'step in [the] criminal' appeal," which is "properly viewed as a belated extension of the original proceeding during which the error allegedly transpired." *Denedo,* 556 U.S. at 913 (quoting and citing *United States v. Morgan,* 346 U.S. 502, 505, n.4 (1954)). A writ of error "*coram nobis* is but an extraordinary tool to correct a legal or factual error." *Id.* (citing *Morgan,* 346 U.S. at 505 n.4).

A CCA's authority to grant a writ of error *coram nobis* is a function of its earlier jurisdiction in that case, not an exercise of the All Writs Act. *See id.* at 914 (emphasis added) ("*Quite apart* from the All Writs Act, we conclude that the NMCCA has jurisdiction to entertain respondent's request for a writ of *coram nobis*."). Thus, as an error *coram nobis* case, *Arness* does not impact our potential jurisdiction in this case. The very basis for jurisdiction to entertain a writ of error *coram nobis* is that the court had prior jurisdiction *and* that the court acted and now needs to correct its prior action. There can be no jurisdiction to entertain a writ of error *coram nobis* in a court that has not previously exercised jurisdiction over the case. Thus, ultimately, *Arness* simply stands for the unsurprising proposition that a CCA may not extend jurisdiction it never had, to correct an earlier error it never made, in a case subject only to JAG review after the JAG denied relief, elected not to refer the case to the CCA, and the case was final. Had the court held otherwise, it would have sanctioned the type of end-run around Article 69, UCMJ, JAG review that the Government fears.[15] Petitioner is not seeking an extension of jurisdiction we never had. Nor are we interfering with any Article 69, UCMJ, review the JAG may eventually conduct in Petitioner's case. Instead, Petitioner seeks exercise of our potential jurisdiction (based on the actual

---

[15] The Government argues that if this Court finds it has jurisdiction in this case, this "opens the door to substantive, merits review, of cases never before heard by this Court," allowing "subjurisdictional cases to receive merits review." Resp't's Mot. for *En Banc* Recon. of 21 Aug 2019 at 4. We disagree. As we will further discuss below, the extraordinary writ standard of review prevents this.

jurisdiction that we may yet have) as we have outlined above. And, as to the portions of his petition that may meet the extraordinary writ standard of review—separate and apart from post-trial appellate review—we are empowered to act. We therefore proceed to the merits of his petition.

**B. Merits of the Writ Petition**

*1. Writ standard of review*

Under the All Writs Act, even when a writ may be "in aid of" a court's jurisdiction, the writ may issue only when "necessary or appropriate." *Denedo,* 66 M.J. at 121. The propriety of issuance of the writ is a second, separate analysis.

A writ of mandamus is "a drastic instrument which should be invoked only in truly extraordinary situations." *United States v. Labella*, 15 M.J. 228, 229 (C.M.A. 1983). This writ has traditionally been used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche,* 319 U.S. at 26. Only exceptional circumstances amounting to a "clear abuse of discretion or usurpation of judicial power" justify the invocation of such a writ. *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 383 (1953) (citation and internal quotation marks omitted).

The high standard for issuance of a writ ensures that the writ does not serve as a substitute for ordinary course appellate review. "[A]n appellate court cannot rightly exercise its discretion to issue a writ whose only effect would be to avoid [the statutory] conditions [of appellate review] and thwart the Congressional policy against piecemeal appeals in criminal cases." *Roche,* 319 U.S. at 30 (citing *Cobbledick v. United States,* 309 U.S. 323 (1940)). It is a strict application of the writ standard of review that ensures maintenance of "orderly appellate procedure" and prevents "use of the writ as a substitute for an appeal." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 274 (1942).

Therefore, to prevail on an extraordinary writ before our Court, CAAF has held that a petitioner must show that: "(1) there is no other adequate means to attain relief; (2) the right to issuance of the writ is clear and indisputable; and (3) the issuance of the writ is appropriate under the circumstances." *Hasan*, 71 M.J. at 418 (citing *Cheney v. United States Dist. Court*, 542 U.S. 367, 380-81 (2004)).

As an initial matter, we note that in addition to asking this Court for a writ of mandamus disqualifying the military judge, Petitioner also seeks relief for the substantive issues he raised in clemency that are currently pending before the military judge in the post-trial Article 39(a) session. For this other requested relief, there exists "other adequate means to attain

relief" during the normal course of the post-trial proceedings and the normal course of post-trial review. Therefore, Petitioner does not meet the standard for extraordinary writ consideration of the substantive issues that underlie the post-trial Article 39(a) session or his newly raised claim of UCI.

By contrast, the normal appellate process is not an "adequate means to attain relief" from the harm Petitioner alleges—that a biased or apparently biased judge will continue to preside over his court-martial. This is true regardless of Petitioner's sentence and whether it would qualify for Article 66, UCMJ, review without referral by the JAG because Petitioner's trial is still not complete.

Unique to this case, based on its procedural posture, the military judge has been called on to review the propriety of three of his trial rulings at a post-trial Article 39(a) session ordered by the convening authority. He has been asked to consider whether he erred in those decisions—and to potentially grant Petitioner a mistrial—when some evidence has been raised to suggest the military judge is or appears to be biased against Petitioner and/or his counsel. The military judge may have but one remaining ruling—denying a mistrial. Or he could elect to grant a mistrial and potentially be detailed to preside over a second trial should the convening authority pursue one. Regardless of the *number* or *quality* of remaining discretionary actions the military judge will be called upon to take in Petitioner's case, the military judge is still presiding over the case and has substantive rulings pending which could affect the findings and the sentence. The harm Petitioner alleges is the same as was present in *Hasan*. Therefore, we find the first prong of *Hasan* met in relation to Petitioner's request to disqualify the military judge.

For this issue, we therefore turn to the substance of the writ petition: whether "the right to issuance of the writ is clear and indisputable" and whether "the issuance of the writ is appropriate under the circumstances." *Id.*

### 2. Standard for disqualification of a military judge

An accused "has a constitutional right to an impartial judge," *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (citation omitted), and a right to "present his case with assurance that the arbiter is not predisposed to find against him." *United States v. Butcher,* 56 M.J. 87, 90 (C.A.A.F. 2001) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)). That said, "[t]here is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001). R.C.M. 902 "divides the grounds for disqualification into two categories—specific

circumstances connoting actual bias and the appearance of bias." *Quintanilla*, 56 M.J. at 44-45.

Among the specific situations requiring recusal on grounds of actual bias is "[w]here the military judge has a *personal bias* or prejudice concerning a party." R.C.M. 902(b)(1) (emphasis added). "[R]emarks, comments, or rulings of a judge do not constitute bias or partiality, 'unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Quintanilla*, 56 M.J. at 44-45 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). As the Supreme Court has explained, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Rather, "only in the rarest circumstances" would a military judge's rulings "evidence the degree of favoritism or antagonism required" when no extrajudicial evidence of bias is involved. *Id.* Moreover, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Simply put, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" do not establish bias or partiality. *Id.* at 555-56.

Regarding the appearance of bias, "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a). We thus use an objective standard to identify the appearance of bias: "[a]ny conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *Hasan*, 71 M.J. at 418 (first alteration in original) (citation omitted). Recusal of the military judge based on the appearance of bias "promote[s] public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988); *see also Liteky,* 510 U.S. at 548 ("[W]hat matters is not the reality of bias or prejudice but its appearance."). Apparent bias is of special importance in a military justice system, in which commanders convene courts-martial and select the members who serve on them. In such a system, "military judges serve as the independent check on the integrity" of the process; thus, the very validity of our system of military justice "depends on the impartiality of military judges in fact and in *appearance*." *Hasan,* 71 M.J. at 418-19 (emphasis added).

### 3. Review of the military judge's actions during trial

Petitioner bases his allegations of bias on a perceived disparity in the military judge's rulings on objections between the Defense and the Government, on the military judge's demeanor during the trial, and on the military

judge's evidentiary and instructional rulings adverse to the Defense. During the post-trial Article 39(a) session, Petitioner's trial defense counsel submitted four affidavits and called two witnesses in support of his motion for recusal.

Affidavits were submitted from the court reporter, the bailiff, a Marine who served as a brig chaser, and a Defense witness, all of whom had observed Petitioner's trial. In the affidavits, these observers stated that the military judge had appeared to favor the Government in dealing with objections, used a harsher tone of voice and attitude when addressing the Defense, and afforded the Government wider latitude in questioning witnesses. One observer stated that the military judge had rolled his eyes and shaken his head several times during Defense arguments.

The Defense also submitted a detailed breakdown of the military judge's rulings on trial objections, arguing that the military judge had sustained more Government objections than Defense objections, often without requiring the Government to articulate its objection or allowing the Defense to respond. The Defense also submitted evidence that the counsel were so concerned that the military judge disliked the lead trial defense counsel that they made a last-minute change, having the assistant defense counsel deliver the closing argument even though she was less prepared to do so.

During the post-trial hearing, the Defense also presented testimony from two of the witnesses who had observed Petitioner's trial: the court reporter and a Defense witness. They expanded upon the statements in their affidavits. The court reporter explained that the military judge had rolled his eyes at the lead trial defense counsel and appeared to be frustrated with him. The Defense witness stated he believed the military judge had treated the Defense more harshly and appeared to assist the Government during objections.

We find this evidence, which all relates to the military judge's conduct within the judicial context, fails to rebut the strong presumption of the military judge's impartiality. Our review of the record indicates that the military judge entertained all of the trial defense counsel's pretrial motions, including last-minute issues that arose on the first day of trial. He permitted extensive oral argument on the motions and often ruled in the Defense's favor. He asked probing questions of both sides, compelled the Government to produce transcripts and witnesses for trial, and granted the Defense's only challenge for cause of a member, which the Government opposed. We find no

indication that the military judge limited the Defense's ability to present its theme, theory, and case.[16] Taken together, the military judge's conduct during the trial does not demonstrate actual bias or the appearance of bias.

### 4. Post-trial Article 39(a) hearing

Immediately after findings were announced, Petitioner's trial defense counsel filed a written motion for a mistrial, arguing the military judge erred by instructing the members on the defense of accident instead of the defense of mistake of fact as to identity.[17] The military judge heard oral argument on the motion, denied it, and the case proceeded to sentencing. After adjournment, the defense counsel filed an extensive clemency request with the convening authority, outlining his view of three substantive legal errors he argued the military judge made and requesting a post-trial hearing. In addition to alleging the military judge erred by refusing to provide the mistake of fact instruction, the Defense argued the judge further erred by refusing to permit the Defense to present evidence of the character for truthfulness of Petitioner and his then-girlfriend, who was a key witness at trial. When the convening authority's staff judge advocate advised the convening authority against ordering a post-trial Article 39(a) session, the trial defense counsel filed another clemency request, outlining what he urged were errors in the staff judge advocate's analysis and reiterating his request for a post-trial Article 39(a) session.

The convening authority then ordered a hearing on the three requested issues. The decision of whether to grant such a request for a post-trial Article 39(a) hearing is "a matter for the convening authority's sound discretion." *United States v. Meghdadi,* 60 M.J. 438, 441 (C.A.A.F. 2005) (quoting *United States v. Ruiz,* 49 M.J. 340, 348 (C.A.A.F. 1998)). The convening authority did

---

[16] We note the lead trial defense counsel's view of relevance was at times somewhat creative, as was his view of the appropriate Military Rule of Evidence 403 balancing of the evidence he sought at times to elicit. These views, combined with the trial defense counsel's persistence in pursuing these theories—often re-approaching the same lines of questioning after Government objections had been sustained—may have contributed to the appearance of annoyance by the military judge and his sustaining of Government objections sometimes without elaboration of their basis.

[17] Petitioner was convicted of grabbing the buttocks of the female victim at a formal military ball. His defense was that he must have mistaken the victim for his girlfriend, who was also at the ball, closely resembled the victim, and had switched places with the victim in a crowded area next to Appellant just prior to the offensive touching.

so in this case, even though such requests are "generally disfavored." *Id.* (quoting *United States v. Williams,* 37 M.J. 352, 356 (C.M.A. 1993)). Once the convening authority ordered the post-trial Article 39(a) session, the Defense filed a post-trial written motion for a mistrial based on the three alleged legal errors, attaching his correspondence with the convening authority to the motion. He requested the convening authority recommend that the trial judiciary assign a different military judge to the post-trial hearing, and he asked the trial counsel to support a motion for the military judge to recuse himself. The convening authority and trial counsel denied these requests, and the Government opposed the motion for a mistrial.

At the post-trial Article 39(a) session, Petitioner was represented by civilian defense counsel in addition to his military defense counsel, which included the lead trial defense counsel Petitioner alleges was the subject of the military judge's ire. This civilian defense counsel had not represented Petitioner at trial. The military judge opened the Article 39(a) session by stating that the convening authority had ordered the post-trial hearing to "inquire into three matters,"[18] which were the three alleged substantive errors the Defense had raised. When asked later, the military judge reiterated that the purpose of the post-trial hearing was "to look at those three issues" that were alleged in the clemency submissions.[19] He noted that the Defense had also made a recusal motion and stated, "[S]o we will take that up on the record as well."[20]

The military judge then permitted voir dire in connection with the motion to recuse. During voir dire, the civilian defense counsel attempted to question the military judge on his knowledge of the standard for recusal. He sought to probe the military judge's thought process for ruling the way he did on the three substantive issues that were the subject of the hearing. Many of the civilian defense counsel's questions and comments—couched as questions— were inappropriate for voir dire.[21] They constituted an apparent attempt to quiz the military judge on his knowledge of certain legal standards or to get

---

[18] App'x C to Petition [Art. 39(a) Hearing], Track 1 at 4:05.

[19] Art. 39(a) Hearing, Track 3 at 24:45.

[20] Art. 39(a) Hearing, Track 1 at 4:42.

[21] For example, at one point, the counsel defended his lines of inquiry by asking, "How can I show you or get into your mind about the appearance of your own potential bias without asking you questions about particular determinations that you made?" *Id.* at 32:15-32:33.

him to commit to certain positions favorable to the Defense.[22] When asked why he had denied the post-findings mistrial motion, the military judge stated his justification for denying the mistrial was in the record.[23] He stated his ruling was a legal, evidentiary ruling based on what he had observed in court—not a ruling based on bias. It is apparent that the civilian defense counsel was attempting to co-opt the voir dire process to probe the military judge's past and future decision-making process as it related to the three substantive issues that were the subject of the Article 39(a) session. Nevertheless, the military judge answered the questions he believed were proper for voir dire. Whenever the trial counsel objected and attempted to confine voir dire to its proper purpose, the civilian defense counsel requested and the military judge permitted him to be heard in response.

After voir dire, the military judge permitted the Defense to present evidence and argument in support of their recusal motion. Although the trial counsel was willing to stipulate that the court reporter—a key Defense witness—was honest, the Defense insisted upon calling a witness to show his character for truthfulness, and the military judge allowed it. He allowed the Defense to take an in-place recess to line up their next witness, and ultimately, the Defense called four witnesses to testify the court reporter was truthful. As described above, both the court reporter and the Defense witness testified that the military judge had appeared annoyed with the lead defense counsel during trial. After presentation of evidence, the parties conducted further voir dire. The military judge then heard argument on the recusal motion,

---

[22] For example, the Defense tried to get the military judge to agree that a Defense witness was a reasonable person within the meaning of the apparent bias standard. *See* Art. 39(a) Hearing, Track 3 at 21:50. The civilian defense counsel also attempted to box the military judge into committing that it would reduce any appearance of partiality if he recused himself and allowed another judge to consider the post-trial Article 39(a) issues, arguing recusal was the "best possible situation" to allow another judge to decide the motion and ensure "the record is clean." *Id.* at 44:38-44:53.

[23] We did not find a written or verbal ruling in the record. The military judge's questioning indicates that he did not believe the Defense presented evidence that the Petitioner honestly mistook the victim for his girlfriend when he touched the victim's buttocks. Petitioner's statements were that he had been consuming alcohol at the military ball, did not know what incident the victim was talking about, and surmised he must have confused the victim with his girlfriend. The evidence showed the victim and Petitioner's girlfriend looked alike and that they had switched places—potentially without Petitioner's knowledge—in a dark, loud, crowded place just before Petitioner touched the victim's buttocks.

which he denied. The Defense then requested a stay of proceedings to allow counsel to file an extraordinary writ petition with this Court, which the military judge also denied.[24]

At that point, the military judge confirmed the parties did not have any further evidence to present on any other issues, noted he would re-read the parties' briefs and consult the record of trial, and then stated, "I am not granting any oral argument on these issues, therefore this Article 39(a) is terminated," and abruptly ended the hearing.[25] When trial defense counsel began speaking, saying, "Just for the record, your Honor," the military judge said, "We're off the record," and told counsel he could submit anything he wanted in writing.[26] The military judge then left the courtroom.

A member of Petitioner's defense team represented a different client before the military judge later that same day. In response to voir dire in that case, the military judge stated that the earlier voir dire during Petitioner's post-trial Article 39(a) session had made him feel uncomfortable and that he (the military judge) had only denied the Defense the ability to present oral argument (when requested) one other time across hundreds of motions.

*5. Review of military judge's actions post-trial*

Based on our review and consideration of the post-trial record, we find the military judge improperly disallowed oral argument and that, in the context of the facts and circumstances of this case, his actions give rise to an appearance of bias. First, it is apparent that at the beginning of the hearing the military judge and the parties all contemplated that the Defense and Government would have an opportunity to be *heard* on all the substantive issues at the hearing. When the civilian defense counsel strayed from proper voir dire questions into commentary or argument on the three issues that related to the mistrial motion, the military judge repeatedly told the civilian defense counsel that he could make those points during argument. Then the military judge allowed both sides to present oral argument on the recusal motion. This initial willingness to hear argument on the motion for a mistrial

---

[24] In the alternative, the trial defense counsel asked the military judge to support the Defense's efforts for the JAG to refer the case to NMCCA for review. Trial defense counsel noted that the case was "sub-jurisdictional" and that a writ petition would be in his client's interests because the case may not otherwise reach NMCCA.

[25] Art. 39(a) Hearing, Track 4 at 6:41-7:21.

[26] *Id.*

thus casts a pallor of partiality on the subsequent, sudden denial of oral argument on that same motion.

Second, multiple procedural rules contemplate that oral argument may be presented in conjunction with the issues taken up at the post-trial Article 39(a) session. The convening authority had ordered the post-trial session—as he was permitted to do under R.C.M. 1102(d) any time before taking initial action—for the specific purpose of addressing three discrete issues. Once such a hearing has been ordered, the military judge "shall take such action as may be appropriate." R.C.M. 1102(e)(2). The Defense's written brief for the post-trial Article 39(a) session indicated the Defense desired oral argument on the three substantive issues the convening authority had referred for review. The procedural rule in effect at the time of the post-trial Article 39(a) stated, "Upon request, either party is entitled to an Article 39(a) session *to present oral argument . . .* concerning the disposition of written motions." R.C.M. 905(h) (emphasis added).

Given that the post-trial Article 39(a) session had been ordered by the convening authority, and the Defense filed a written motion invoking their right to present oral argument, the Defense was entitled to present oral argument at this post-trial hearing. The CAAF has held that R.C.M. 905 "requires that the military judge hold a hearing on a written motion" and that the language of R.C.M. 905(h) is "compulsory." *United States v. Savard,* 69 M.J. 211, 212-13 (C.A.A.F. 2010) (holding military judge erred by resolving written motion without a hearing over Defense objection, but finding error harmless).[27] Additionally, once the convening authority ordered the post-trial Article 39(a) hearing, the Defense motion requested that the military judge grant a mistrial pursuant to R.C.M. 915, which requires that "the military judge *shall* inquire into the views of the parties on the matter." R.C.M. 915(b) (emphasis added).

The military judge's failure to allow any oral argument thus not only ran afoul of R.C.M. 905 and 915, but also served to frustrate the Defense's attempts to defend Petitioner. From our perspective, in addition to being

---

[27] We do not hold that the mere act of filing a written post-trial motion entitled the Defense to a post-trial Article 39(a) hearing at which to present oral argument. However, once the hearing was ordered by the convening authority under R.C.M. 1102, R.C.M. 905 plainly contemplates—as the parties and the military judge initially did here—that each side will be able to present oral argument "concerning the disposition of written motions," which in this case encompassed the three issues for which the convening authority had ordered the hearing.

required, oral argument was a component of the full and fair litigation of these substantive issues merited at the specially-convened session—particularly with respect to the military judge's decision to instruct the members on the defense of accident as opposed to the defense of mistake of fact (which the Defense requested and was denied)—as any of the three issues could potentially result in a mistrial if the military judge were to find he had erred. The military judge may have believed that at least some of the issues had been fully litigated during trial, as the parties had discussed the Defense motion for a mistrial based on the alleged instructional error after the members returned findings, and so this argument was not new to the military judge. But the parties never discussed the substance of the two other alleged errors relating to character for truthfulness of Petitioner and his then-girlfriend as it related to the Defense mistrial motion.[28] In any event, the convening authority not only sought additional input from the military judge on all three issues, but apparently saw fit to grant the trial defense counsel a forum in which he could present evidence and argument to the military judge.[29]

We recognize that denying oral argument—in and of itself, and in an ordinary case—may not typically rise to the level of requiring recusal of the presiding judge. And we recognize it is the military judge's responsibility to ensure "that court-martial proceedings are conducted in a fair and orderly manner, without unnecessary delay or waste of time or resources." R.C.M. 801(a), Discussion. Thus, the military judge could properly control the time, place, duration, and manner of oral argument. But it is difficult to square the military judge's duty to ensure fairness—both actual and the appearance thereof—with the judge's decision to deny oral argument, in toto, on potentially case-dispositive issues the Defense had fought hard to be able to present and regarding which the convening authority desired further review.

---

[28] At trial, the Defense attempted to elicit evidence of the Petitioner's character for truthfulness, but the trial counsel objected on grounds of relevance and the defense counsel did not seek an Article 39(a) to advocate in favor of eliciting the evidence. When trial defense counsel attempted to elicit similar testimony pertaining to Petitioner's ex-girlfriend—the Defense's key witness—the parties did discuss whether her credibility had been attacked, and the military judge ruled it had not been.

[29] Although on appellate review this Court might consider issues of forfeiture if the Defense had failed to adequately preserve issues of error, for purposes of the post-trial Article 39(a) session, the convening authority sought analysis from the military judge.

In light of the requirements of R.C.M. 905, the military judge's choice to deny all oral argument and abruptly end the hearing, following his denial of the recusal motion, was "conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *Hasan*, 71 M.J. at 418 (citation omitted).

Regardless of the merits of the three substantive issues or the Defense's mistrial motion as a whole, the military judge's actions under the circumstances could lead a reasonable member of the public to believe he was biased against the Defense. His denial of oral argument would not benefit the Defense; it would only benefit the Government, which sought to maintain the status quo. The improper denial was unarguably an action that appears to inure to the detriment of the Defense and clearly served to frustrate their efforts to persuade the military judge to grant a mistrial. Viewed in conjunction with evidence that, to some observers, the military judge was visibly annoyed with the trial defense counsel during trial, this action gives rise to an appearance of bias.

We compare the facts of Petitioner's case to other cases in which the courts have evaluated the denial of a recusal motion—most arising in a post-conviction appellate context. Comparing this case to others, we believe the Petitioner's writ petition has merit. We first consider that in Petitioner's case the military judge is still being "called upon to exercise discretion on [a] matter of significance concerning findings." *Butcher,* 56 M.J. at 92 (finding the first *Liljeberg* factor was not met because the opposite was true—the military judge was *not* called upon to exercise discretion in any significant matters after the grounds for recusal arose). It is a "matter of discretion" for the military judge to declare a mistrial. R.C.M. 915(a). Petitioner is now in the position of having to accept a discretionary ruling from an apparently biased judge, made without the benefit of oral argument, which the same judge improperly denied in toto.

We next note that the military judge's challenged conduct—refusing to hear oral argument on post-trial issues for which a post-trial Article 39(a) hearing was specifically ordered by the convening authority—is "conduct bearing on the merits of the proceedings" which could "undermine the basic fairness of the judicial process." *Butcher,* 56 M.J. at 93 (explaining why the CAAF found the third *Liljeberg* factor not met). It is also conduct that is "adverse to" Petitioner, *id.* at 94 (Baker, J., Concurring), and not a case of "systematic bias." *Id.* at 95 (Sullivan, J., Dissenting) (referring to the bias alleged in *United States v. Norfleet*, 53 M.J. 262, 271 (C.A.A.F. 2000), where the military judge's supervisor was the same commander who forwarded the case for referral consideration). These circumstances weigh heavily in favor of granting relief to Petitioner.

Under the facts and circumstances presented here, the chance is simply too high that a reasonable member of the public will not perceive the military judge was able to fairly exercise his considerable discretion in these matters. "'[T]aken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge's actions." *Quintanilla,* 56 M.J. at 78 (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)). Courts-martial must not just be fair, but must also *appear* to be fair. When the partiality of the presiding military judge is at issue, ultimately "what matters is not the reality of bias or prejudice but its appearance." *Liteky,* 510 U.S. at 548. Ensuring the appearance of fairness by the presiding judge not only serves "to reassure the parties as to the fairness of the proceedings," but it also "is designed to enhance public confidence in the integrity of the judicial system." *Quintanilla*, 56 M.J. at 45 (citing *Liljeberg*, 486 U.S. at 860). We believe the circumstances in this unique case raise an appearance of bias sufficient to warrant remedial measures as a means of ensuring the appearance of fairness and enhancing public confidence in these proceedings.

Accordingly, we find that with respect to a portion of the requested relief "the right to issuance of the writ is clear and indisputable; and . . . the issuance of the writ is appropriate under the circumstances." *Hasan*, 71 M.J. at 418 (citing *Cheney*, 542 U.S. at 380-81).

## III. CONCLUSION

The petition for extraordinary relief in the nature of a writ of prohibition or a writ of mandamus is **GRANTED IN PART**. The military judge who presided over Petitioner's trial is ordered removed from the case. The remainder of Petitioner's requested relief is **DENIED**.[30] The Stay is **LIFTED.** The appropriate authority shall detail a new military judge in this case who shall preside over a post-trial 39(a) hearing to consider the legal issues identified by the convening authority.

Chief Judge CRISFIELD, Senior Judge KING, and Judges GASTON and STEWART concur.

---

[30] We leave to the sound discretion of the replacement military judge how to proceed with the further progress of this case.

23

LAWRENCE, Judge, with whom STEPHENS, Judge, joins (dissenting):

I respectfully dissent. I believe the majority commits the same overreach as our sister service court of appeals did in *United States v. Arness*, and will meet a similar fate. 74 M.J. 441 (C.A.A.F. 2015).

Fundamentally, as an Article I court, our jurisdiction is limited to the powers conferred by statute mandating that "we may not act unless Congress has given us the authority to do so." *Loving v. United States*, 62 M.J. 235, 239-40 (C.A.A.F. 2005); s*ee also United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018). Here, the adjudication of a sub-jurisdictional sentence forecloses our direct means of review, as the Judge Advocate General [JAG] has been granted—expressly by statute—sole discretionary authority to take no action, to resolve the matter as he determines appropriate, or to refer it to this Court to review matters of law. Absent the JAG's decision—which is independent of the parties and this Court—to send the matter for our review, we will never have jurisdiction. Any consideration of the merits of this petition necessarily relies upon improper expansion of our jurisdiction beyond statutory grant, thereby functioning as an advisory opinion. This we cannot do.

"The courts of criminal appeals are courts of limited jurisdiction, defined entirely by statute." *Arness*, 74 M.J. at 442. Our limited jurisdiction—relevant to Petitioner's writ—is defined by Articles 66 and 69, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 866, 869 (2012). Article 66(b)(1) requires this Court to review the record in each trial "in which the sentence, as approved, extends to death, dismissal of a commissioned officer, cadet, or midshipman, dishonorable or bad-conduct discharge, or confinement for one year or more." Our actual and potential jurisdiction is reached through Article 66(b), where the JAG "*shall* refer to a Court of Criminal Appeals [CCA]" those cases that enjoy jurisdiction as defined by the statute. Art. 66, UCMJ (emphasis added). Critically different is Article 69(a), which provides that the JAG *may* send the case for our review of matters of law.

Those cases tried at *general court-martial* receiving a sentence not meeting the minimum requirements for mandatory review under Article 66 "shall be examined in the office of the Judge Advocate General." Art. 69(a), UCMJ. However, those cases not reviewed by this Court pursuant to Article 66, or by the JAG pursuant to Article 69(a)—such as this case tried at a special court-martial—can still be reviewed by the JAG, either sua sponte or "upon application of the accused" for *inter alia*, "error prejudicial to the substantial rights of the accused." Art. 69(b), UCMJ.

Once a case is subject to review by the JAG by either of these means, the JAG *may* refer the case to the CCA. Specifically, Article 69(d) provides that the CCA may review, under Article 66:

(1) any court-martial case which

(A) is subject to action by the Judge Advocate General under [§ 869], and

(B) is sent to the Court of Criminal Appeals by order of the Judge Advocate General; and

(2) any action taken by the Judge Advocate General under this section in such case.

The All Writs Act states that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see also United States v. Denedo*, 556 U.S. 904, 911 (2009); Rule for Courts-Martial 1203(b), Discussion. "[M]ilitary courts, like Article III tribunals, are empowered to issue extraordinary writs under the All Writs Act." *LRM v. Kastenberg*, 72 M.J. 364, 367 (C.A.A.F. 2013) (quoting *Denedo*, 556 U.S. at 911) (alteration in original). However, the All Writs Act does not serve as "an independent grant of jurisdiction, nor does it expand [our] existing statutory jurisdiction." *Id.* at 367 (citing *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999)). Thus, in order to grant Petitioner's prayer for relief, the All Writs Act requires that the requested writ be "'*in aid of*' the issuing court's jurisdiction." *Goldsmith*, 526 U.S. at 534 (emphasis added).

In *Arness*, the Court of Appeals for the Armed Forces [CAAF] determined that referral by the Air Force JAG to the CCA is "a statutory prerequisite" for a CCA's review. 74 M.J. at 443. The CAAF further explained that Article 69(d) does not grant a CCA the authority to review "every case which is *subject to action* by the [JAG] pursuant to Article 69. Instead, it grants the CCA authority to review any *action taken* by the [JAG] . . . *that the [JAG] elects to refer to the CCA.*" *Id.* (emphasis added). Lieutenant Colonel Arness had been convicted at general court-martial of several specifications of absenting himself without authority, false official statements, and conduct unbecoming an officer. He was sentenced to 11 months' confinement and a reprimand. The Air Force JAG completed review under Article 69(a) and "determined that the findings and sentence were supported in law, and elected not to send the case to the CCA for review under Article 69(d)." *Id.* at 442. Since the JAG did not refer the case to the CCA, the CAAF held that "[c]onsideration of extraordinary relief [was] not 'in aid' of the CCA's jurisdiction, because the CCA had none in the first place." *Id.* at 443. Accordingly, the CAAF rejected the petition.

Here, the entirety of Petitioner's adjudged sentence by the members at special court-martial was a reduction in grade. Consequently, he is neither eligible for mandatory review by this Court pursuant to Article 66, nor to review by the JAG pursuant to Article 69(a). Rather, Petitioner will be entitled to a review by a judge advocate pursuant to Article 64, UCMJ. He may also have his case reviewed, sua sponte, by the JAG, or may seek review from the JAG, pursuant to Article 69(b). But because the case is not yet final, Petitioner has not yet had the opportunity to seek review by the JAG. The JAG, of course, has not yet had the opportunity to consider his options—and the statute reserves that consideration to him alone.

The majority opinion has inexplicably ignored the simple and unambiguous language of the statute—the JAG has absolute discretion to act on a case with a sentence below the jurisdictional limit of this Court [a sub-jurisdictional case]. First, the JAG may identify, sua sponte, "newly discovered evidence, fraud on the court, lack of jurisdiction over the accused or the offense, error prejudicial to the substantial rights of the accused, or the appropriateness of the sentence." Art. 69(b), UCMJ. Most cases of this nature, however, arise by way of application to the JAG by a petitioner using these same grounds to pray for relief. Once in receipt of such an application, the JAG alone is vested with statutory authority to review and decide whether to take appropriate action by: (1) taking no action by denying the application; (2) setting aside the findings or sentence; (3) ordering a rehearing; (4) dismissing the charges; or (5) sending it to the CCA for Article 66 review. Art. 66(c) and (d), UCMJ. Here, the majority opinion recognizes our limited jurisdiction, but simply disregards the central, statutory—and independent—role of the JAG in considering the merits of a sub-jurisdictional matter *not* sent to us by the JAG. The statute explicitly confers this role upon the JAG alone, granting him total discretion in reviewing sub-jurisdictional matters and determining the appropriate action.

The majority usurps the powers Congress specifically vested in the JAG to consider sub-jurisdictional applications and determine whether they may be resolved through means under his discretion, including sending cases to this Court for review. Far from being "in aid of" our jurisdiction under the All Writs Act, 28 U.S.C. 1651(a), the majority has judicially stripped jurisdiction from where it resides in order to resolve the merits of the petition.

The Supreme Court in *FTC v. Dean Foods Co.* addressed the doctrine of potential jurisdiction, in which it noted that "where a case *is within the appellate jurisdiction* of the higher court a writ . . . may issue in aid of the appellate jurisdiction." 384 U.S. 597, 603 (1966) (quoting *McClellan v. Carland*, 217 U.S. 268, 280 (1910)) (alteration in original) (emphasis added). The Court went on to cite other cases in which an injunction was appropriate

to *preserve* the court's jurisdiction pending other administrative actions or other review required under statute. The Court said that "[i]t would stultify congressional purpose to say that the [Federal Trade] Commission did not have the incidental power to ask the courts of appeals to exercise their authority derived from the All Writs Act." *Id.* at 606. The Court noted that, absent injunctive relief, undoing a merger and effectively restoring the competitive marketplace would be impossible should courts of appeals not step in prior to irreparable harm having been suffered. Application of the doctrine was not a matter of convenience, but of absolute necessity to *remain consistent* with the statutory purpose.

Potential jurisdiction applies whenever the findings and sentence are not yet announced and when a jurisdictional sentence has been announced. Appellate courts in receipt of a petition at this stage rightly consider that there is potential for their jurisdiction under Article 66. We necessarily take action to preserve—aid—our ability to continue the development of what is at that stage of the proceeding and at the time of the petition an open-ended question. That is not the case here and in other cases where the announced sentence was unambiguously and forever below the statutory threshold for direct review. We do little to discourage piecemeal litigation, we increase delay, and we effectively provide an advisory opinion when we consider the merits in a matter such as this, which is one or more steps premature or may never ripen at all, absent independent action by the JAG. We also all but invite an accused with a sub-jurisdictional sentence to completely bypass the statutory review scheme set out in Articles 64, 69(a), and 69(b) by immediately petitioning this Court for extraordinary relief.[1]

Proper application of the statute and the doctrine of potential jurisdiction preserves those petitions for extraordinary relief brought by petitioners *prior to* announcement of a sub-jurisdictional sentence, where potential appellate jurisdiction still exists. Because Petitioner's adjudged sentence does not—and cannot—qualify for automatic review by our Court pursuant to Article 66, and because Petitioner has not submitted an application to the JAG for consideration, much less the petition sent by the JAG to this Court pursuant to his exclusive authority under Article 69(d), this Court has no authority to presume the JAG's action and create jurisdiction. There is no feasible way by

---

[1] We would equally be inviting an accused whose sub-jurisdictional case was referred to trial on or after 1 January 2019, to bypass the new statutory review scheme set out in Article 69(d), UCMJ (2019).

which this Court may claim jurisdiction in a sub-jurisdictional case without completely ignoring the statute and the JAG's indispensable role.

The majority discusses potential jurisdiction as a "possible pathway" for CCAs to take on matters situated such as the present petition. Majority Opinion at *4. In actuality, this "possible pathway" is a newly-paved highway carved straight through the statute. The majority forges ahead to the merits without regard to the statute and the powers Congress reserved to the JAG.

In enacting Article 69, Congress specifically conferred upon the JAG—not the CCA—authority to consider alleged errors in a case with a sub-jurisdictional sentence. In doing so, Congress made abundantly clear that there would be an intermediary and indispensable step before we might ever consider such a matter. Unlike in *Dean Foods Co.*, our statute specifies that the JAG is vested with the authority to review and rectify any harm to Petitioner. Only our stay of proceedings below has interrupted completion of the military judge's ruling on the remaining issues and action by the convening authority. Nonetheless, the majority opinion is to *gain*—that is, manufacture—potential jurisdiction by circumventing the express authority of the JAG.

This special court-martial had the authority to adjudge a sentence within the appellate jurisdiction of this Court. Prior to the moment the sub-jurisdictional sentence was announced, this Court *had* potential jurisdiction. This is because Petitioner still had the potential to perfect his own appeal should he receive a severe enough sentence to qualify for judicial review from this Court.

A line of cases from the CAAF recognize the application of the doctrine of potential jurisdiction as it relates to Article 66. *See Howell v. United States*, 75 M.J. 386 (C.A.A.F. 2016) (vacating military judge's ruling directing the convening authority to provide Article 13, UCMJ, sentencing credit in the convening authority's action); *LRM v. Kastenberg*, 72 M.J. 364 (C.A.A.F. 2013) (granting pretrial motion allowing special victims' counsel to be heard on factual matters); *Hasan v. Gross*, 71 M.J. 416 (C.A.A.F. 2012) (granting pretrial removal of the military judge for bias, *inter alia*, ordering the forcible shaving of Hasan). The common theme running through each is that—whether the case was in pretrial motions, or after the close of courtroom proceedings while awaiting the convening authority's action—at the time of their petition they all had Article 66 qualifying sentences in play. By operation of 66(b), JAG would have no authority whatsoever but to send cases that meet the statutory qualifications to the CCA. However, what we *once* had jurisdiction over does not continue indefinitely. *Goldsmith*, 526 U.S. at 536 (explaining that there is no source of continuing jurisdiction over actions that a military appellate court had at one time the power to review).

The majority relies on these same cases, although none actually aids Petitioner's argument. In fact, these cases highlight how potential jurisdiction is supposed to work in line with rather than in contravention of the statute. In *Hasan*, the military judge's bias was at issue in a writ of mandamus. At that stage of those proceedings, the possibility of automatic jurisdiction for the Army Court of Criminal Appeals [ACCA] was very much in play. What good would it do to fail to address such an important issue during the infancy of the trial and simply wait for Major Hasan to be convicted and sentenced with an Article 66 qualifying sentence? Under the circumstances, ACCA was correct to act when it did, and when it acted, there was no statutory bar to its jurisdiction. In fact, the wind of potential jurisdiction was at its back. Had Major Hasan filed his extraordinary writ *after* a (hypothetical) sub-jurisdictional sentencing, but prior to convening authority's action, as with this case, I believe ACCA would not have had jurisdiction to hear it.

In *LRM v. Kastenberg*, a writ was used to determine whether a military judge had erred in prohibiting the special victims' counsel for a sexual assault victim from being heard on a motion under Military Rule of Evidence 412. Naturally, this would be something that would aid in the jurisdiction of the CCA. Waiting until all relevant victim rights issues had been ruled upon without legal representation and the trial was concluded would be wasteful and possibly unjust. This would be particularly so from the point-of-view of the alleging victim because an acquittal would permanently foreclose the possibility of any appellate review of this issue.

In *Howell v. United States*, it was actually the Government who sought the extraordinary writ prior to the action by the convening authority on the findings and sentence for the retrial. The Government wanted to clarify what Staff Sergeant Howell's pay rate would be during his re-trial and whether he was entitled to confinement credit resulting from his lower pay rate.

All the above cases have two things in common: they are prime examples of the use of an extraordinary writ to "pause" trial proceedings to seek an answer from an appellate court on an important legal issue that could not wait, and none of them speak whatsoever to the idea that a case with a sub-jurisdictional sentence can avail itself of a writ from a CCA. In fact, there is not a single case the majority can cite for this unique proposition. It has probably never occurred to one receiving a sub-jurisdictional sentence to petition this Court or our sister CCAs, for such a writ, because of the rather plain language of Articles 66 and 69.

The majority comments on *Howell* and injects significant meaning into the fact that the convening authority, under the version of Article 60 applicable at that time, was still free to approve a sub-jurisdictional sentence.[2] The majority then compares the convening authority's statutory option to act with the JAG's statutory option to act in sending a sub-jurisdictional Article 69 case to the CCA, and concludes they are essentially the same in quality for the purposes of potential jurisdiction. First, it would have been incredibly unlikely the convening authority would have approved only a sub-jurisdictional sentence based on the facts of *Howell*. Second, there is a significant difference between the convening authority approving an adjudged sentence and the JAG exercising his Article 69 options. And that significant difference is that the convening authority is the representative of the United States and essentially one of the parties to the litigation. An accused as petitioner is naturally a party, as is a victim with a victims' legal counsel a real party in interest. The JAG is *not* a party to the litigation. He or she is a totally separate actor upon whom none of the parties to the case can force action. In a sub-jurisdictional case, an Article 66 appeal may *never* be perfected and the doctrine of potential jurisdiction—as commonly and properly understood—is extinguished. The way is shut. It was made by Congress and the JAG keeps it, until he alone *may* (or may not) decide the time comes to seek CCA review.

Further, even if the convening authority reduced the sentence to sub-jurisdictional levels, would this not itself be a bar to Article 66 review? Or would the majority insist that the approved sentence, because it could still be considered by the JAG and *possibly* sent to the CCA, still receive direct, automatic appeal? Probably not. And probably because this would cut the JAG out of the process. There is no difference between that scenario and what is happening now. Here, the JAG has been cut out of the process. He *might* receive a petition from First Sergeant Brown, and the JAG *might* send it to this Court, but for some reason, the majority side-steps the statute and the prerogative of the JAG. This presumption, or eagerness, is the same mistake our sister CCA made in *Arness*.

In *Arness*, the Air Force Court of Criminal Appeals (AFCCA) decided that it could second-guess the Air Force JAG's decision to not refer a case to their court. The majority here in its "possible pathway" argues similarly to the AFCCA assertion that it had jurisdiction "because the [JAG] *could have* sent

---

[2] Apparently, the majority's analysis would mean that only cases under the old rules are then available for their invited writ end-run around the JAG.

the case to the CCA for review." *Arness* at 74 M.J. at 442 (emphasis added). Our superior court made clear that AFCCA misread the statute—the CCA could only act on a sub-jurisdictional case referred by the JAG and had no authority to "act" on such a case not referred by the JAG. The CAAF considered and explicitly "repudiate[d] the expansive approach taken" in a line of cases that "entertain[ed] petitions for extraordinary relief where the sentence was less than that required for review before the service courts." *Id.* at 443. Further, as emphasized in Judge Baker's concurring opinion, "if [the JAG's] actions were subject to CCA review without referral to the CCA by the [JAG], then we would expect to have seen multiple cases involving such exercise of jurisdiction." *Id.* at 446 (Baker, J., concurring). We should trust the JAG to review any petition that may be made by First Sergeant Brown, and we should trust the JAG to refer it to us if he believes it merits our review. Not only would we avoid the possibility of a cursory correction by our superior court, we would be following the law.

The majority is unnecessarily transfixed by the argument that the CAAF's decision in *Arness* is inapplicable to this case, yet believes *Howell* does apply based upon the manner of writ employed in each case. Simply put, *Arness* is a case in which the CAAF recognized the JAG's defined role under Article 69 to provide the appellate review for a sub-jurisdictional case. *Arness* rejected the ability of CCAs to seize extraordinary writ jurisdiction and entertain the petition. In contrast, in *Howell*, the appellant had received a sentence (both a punitive discharge and greater than one year of confinement) that would—unless *reduced* below the jurisdictional threshold by the relatively unfettered powers convening authorities had at that time—mandate the JAG's referral to the CCA under Article 66. At its core, at the time of that petition, this Court in *Howell* would undoubtedly hear the matter. That is not the case here. There remains no approach by which the sub-jurisdictional sentence announced by the members panel could be *escalated* by the military judge or the convening authority to bring Petitioner's sentence within the ambit of our Article 66 jurisdiction. The manner of writ employed in each case is inconsequential to our determination when the statute itself is abundantly clear.

The majority's overly-expansive view of the doctrine of potential jurisdiction is inconsistent with the CAAF's holding in *Arness*. Considering *Arness*, I doubt the continued validity of this Court's opinion in *United States v. Booker* as concerns application of Article 69. 72 M.J. 787 (N-M. Ct. Crim. App. 2013). Although the vast majority of that opinion should remain intact with respect to this Court's jurisdiction in Articles 62 and 66, any discussion of our ability to claim jurisdiction independent of the JAG's decision to act pursuant to Article 69(d) has equally been "repudiate[d]" by *Arness*. In order to apply the

doctrine of potential jurisdiction, the case must either have a jurisdictional sentence or still have the possibility of receiving a jurisdictional sentence. Potential jurisdiction cannot exclusively rely upon favorable consideration of matters by the JAG *and* his independent certification to this Court for review. Once a sub-jurisdictional sentence has been announced, the statute simply does not allow a CCA to assert jurisdiction based upon what the JAG *could* do. It is puzzling to suggest that, just because a mistrial is possible,[3] such a complete reset of the trial to the beginning stages where potential jurisdiction would be back in play justifies judicial rewriting of the statute to seize jurisdiction from the JAG following a sub-jurisdictional sentence.

In some sense, I am reminded of Helen Palsgraf minding her business near the scales at the train station. Like the platform guard, the majority rushes at this petition in order to take action to solve some perceived problem. But here, this Court's ultimate legal review, like the injury to Mrs. Palsgraf, is wholly reliant on some other independent, and unforeseeable, action which is quite simply out of the control or knowledge of this Court and the platform guard. If the JAG acts, then we might be able to review this petition, but we have no way of knowing that now. It would be just as improperly presumptuous for us to assume the right to review this case as it would to allocate the responsibility for Mrs. Palsgraf's injuries to the Long Island Railroad. Article 69 makes the JAG the proximate cause of any review of cases with sub-jurisdictional sentences. And that package has not yet exploded.

I would deny the petition.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[3] *See* Majority Opinion at *8 n.10.